**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL URBAN LEAGUE; LEAGUE OF WOMEN VOTERS; BLACK ALLIANCE FOR JUST IMMIGRATION; HARRIS COUNTY, Texas; KING COUNTY, Washington; CITY OF LOS ANGELES, California; CITY OF SALINAS, California; CITY OF SAN JOSE, California; RODNEY ELLIS; ADRIAN GARCIA; NAVAJO NATION; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CITY OF CHICAGO, Illinois; COUNTY OF LOS ANGELES, California; GILA RIVER INDIAN COMMUNITY, | No. 20-16868 <br><br> D.C. No. 5:20-cv-05799-LHK <br><br><br> ORDER |
| *Plaintiffs-Appellees*, | |
| v. | |
| WILBUR L. ROSS, in his official capacity as Secretary of Commerce; UNITED STATES DEPARTMENT OF COMMERCE; STEVEN DILLINGHAM, in his official capacity as Director of the U.S. Census Bureau; UNITED STATES CENSUS BUREAU, | |
| *Defendants-Appellants*, | |
| and | |

STATE OF LOUISIANA; STATE OF
MISSISSIPPI,
                    *Intervenor-Defendants.*

Filed September 30, 2020

Before:  Johnnie B. Rawlinson, Morgan Christen, and
Patrick J. Bumatay, Circuit Judges.

Order;
Dissent by Judge Bumatay

## SUMMARY[*]

### Administrative Stay / Census

The panel denied the government's request for an administrative stay in an action brought by various Cities, organizations and individuals ("Appellees") challenging an August 3, 2020 decision by the United States Census Bureau adopting a census plan ("Replan") to dramatically advance critical deadlines for conducting the 2020 census.

The Census Bureau adopted a new census plan in April 2020 to accommodate the delays caused by COVID-19, which extended the deadline for each step in the census process.  On August 3, 2020, the Census Bureau announced

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

its adoption of the Replan, which accelerated the COVID-19 Plan's deadline for completion of field work and data collection from October 31, 2020 to September 30, 2020.

Appellees challenged the Replan pursuant to the Enumeration Clause of the U.S. Constitution and the Administrative Procedure Act. The district court entered a preliminary injunction staying the Replan's schedule for completion of census field operations and for reporting the census results to the President, and enjoining the government from implementing these deadlines. The government requested an immediate administrative stay of the district court's injunction.

The panel held on the facts of this case that the status quo would be seriously disrupted, rather than preserved, by an immediate administrative stay of the district court's order. The panel held that the district court's September 5, 2020 temporary restraining order and September 24, 2020 preliminary injunction preserved the status quo because they maintained the Census Bureau's data-collection apparatus pending resolution of the appeal. Granting an administrative stay risked rendering the plaintiffs' challenge to the Replan effectively moot. The panel further held that the administrative record compellingly supported the district court's conclusion that moving the October 31 deadline to September 30 would not allow the Census Bureau to complete the census by the December 31, 2020 statutory deadline.

The panel noted that the dissent made four errors. First, the dissent applied the wrong standard for a preliminary administrative stay. Second, as a consequence of this threshold error, the dissent failed to grapple with the consequences of the Census Bureau dismantling the

apparatus for conducting field work before the motion for a stay pending appeal could be decided. Third, the dissent hinged on the unsupported premise that the Census Bureau could meet the December 31 deadline if an administrative stay was issued. Fourth, the dissent addressed several issues that were not properly before the panel at the administrative stay stage.

Judge Bumatay dissented. Because the district court was without authority to issue its injunction, the government is likely to succeed on the merits, and the government will be irreparably harmed without relief, he would grant the request for an administrative stay. The Census Bureau adopted the COVID-19 Plan on April 13, 2020 on the assumption that Congress would extend the statutory deadlines by 120 days; and when Congress did not act, the Census Bureau adopted the Replan schedule. Judge Bumatay would hold that there was no basis for the judiciary to inject itself into this sensitive political controversy and seize for itself the decision to reevaluate the compelling concerns between accuracy and speed, after the elected branches have apparently done so already. At a minimum, the panel should have granted an administrative stay while the court further considered the underlying motion to stay the injunction pending appeal.

## COUNSEL

Jeffrey Bossert Clark, Acting Assistant Attorney General; Sopan Joshi, Senior Counsel to the Assistant Attorney General; Mark B. Stern and Brad Hinshelwood, Appellate Staff; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Melissa Arbus Sherry, Richard P. Bress, Anne W. Robinson, Tyce R. Walters, Genevieve P. Hoffman, and Gemma Donofrio, Latham & Watkins LLP, Washington, D.C.; Sadik Huseny, Steven M. Bauer, Amit Makker, and Shannon D. Lankenau, Latham & Watkins LLP, San Francisco, California; Kristen Clarke, Jon M. Greenbaum, Ezra D. Rosenberg, Dorian L. Spence, Maryum Jordan, Ajay Saini, and Pooja Chaudhuri, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; Wendy R. Weiser, Thomas P. Wolf, and Kelly M. Percival, Brennan Center for Justice, New York, New York; Mark Rosenbaum, Public Counsel, Los Angeles, California; Doreen McPaul, Attorney General; Jason Searle, Attorney; Navajo Nation Department of Justice, Window Rock, Arizona; Michael N. Feuer, City Attorney; Kathleen Kenealy, Chief Assistant City Attorney; Danielle Goldstein and Michael Dundas, Deputy City Attorneys; Office of the City Attorney, Los Angeles, California; Christopher A. Callihan, City Attorney; Michael Mutalipassi, Assistant City Attorney; City Attorney's Office, Salinas, California; Rafey S. Balabanian and Lily E. Hough, Edelson P.C., San Francisco, California; Mark A. Flessner, Corporation Counsel; Justin A. Houppert, Senior Assistant Corporation Counsel; Benna Ruth Solomon and Stephen J. Kane, Deputy Corporation Counsel; and Rebecca Hirsch, Assistant Corporation Counsel; Office of the Corporation Counsel, Chicago, Illinois; Pratik A. Shah, Z.W. Julius Chen, and Merrill C. Godfrey, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; David I. Holtzman, Daniel P. Kappes, and Jacqueline N. Harvey, Holland & Knight LLP, San Francisco, California; for Plaintiffs-Appellees.

Jeff Landry, Attorney General; Elizabeth B. Murrill, Solicitor General; Louisiana Department of Justice, Baton Rouge, Louisiana; Lynn Fitch, Attorney General; Krissy C.

Nobile, Deputy Solicitor General; Office of the Attorney General; Jackson, Missouri; for Amici Curiae States of Louisiana and Mississippi.

James R. Williams, County Counsel; Greta S. Hansen, Chief Assistant County Counsel; Marcelo Quiñones, Lead Deputy County Counsel; Raphael N. Rajendra and Karun Tilak, Deputy County Counsel; Office of the County Counsel, County of Santa Clara, San Jose, California; for Amici Curiae County of Santa Clara and 18 Additional Local Governments.

## ORDER

On August 3, 2020, the United States Census Bureau (Bureau) adopted a census plan (Replan) that dramatically advanced critical deadlines for conducting the 2020 census. Appellees challenged this action pursuant to the Enumeration Clause of the United States Constitution and the Administrative Procedure Act (APA). On September 24, 2020, the district court entered a preliminary injunction staying the Replan's schedule for completion of census field operations and for reporting the census results to the President and enjoining the government from implementing these deadlines. The government has filed an emergency motion to stay the preliminary injunction pending appeal, and a request for an immediate administrative stay pending resolution of the stay motion. In this order, we consider only the request for an administrative stay.

The decennial census is an enormous and complex nationwide operation. It requires nearly a decade of planning and hundreds of thousands of dedicated workers to accomplish. In 2018, after years of planning and testing, the

Bureau adopted a plan to complete the 2020 census. The plan called for an extraordinary effort on the part of the government including hiring 340,000–500,000 field staff. For reasons stated in the record, the district court found that due to significant challenges encountered in the wake of COVID-19, the Bureau suspended field operations in March 2020. When operations resumed, the Bureau was unable to recruit sufficient numbers of field staff. In July 2020, the Bureau estimated that it only retained 38% of the field staff required to complete an accurate and timely census.

As a result of these serious challenges, the district court found that as early as April 2020, the Bureau, the Department of Commerce, and even the President had all publicly acknowledged that the December 31 deadline was no longer attainable. The Bureau adopted a new census plan in April to accommodate the delays caused by COVID-19 ("COVID-19 Plan"). The COVID-19 plan extended the deadline for each step in the process and contemplated that the Bureau would ask Congress for a 120-day extension of the December 31, 2020 delivery deadline for the completed census report. The Bureau's work proceeded according to the COVID-19 Plan until August 2020.

In early August, a "senior Department [of Commerce] official" directed the Bureau to change course and prepare a new plan for completing the census by the December 31, 2020 statutory deadline. Senior Bureau staff were given just four to five days to develop this "Replan." On August 3, 2020, the Bureau announced its adoption of the Replan, and its central feature: accelerating the COVID-19 Plan's deadline for the completion of field work and data collection from October 31 to September 30. On September 24, the district court entered a preliminary injunction preventing the Bureau from implementing the September 30 deadline to

stop field work and data collection.    The government
requests an immediate administrative stay of the district
court's injunction.

I

The government has filed a single emergency motion
seeking a stay pending appeal, and also seeking an
administrative stay pending resolution of the motion for stay
pending appeal.    We recently established    that an
administrative stay "is only intended to preserve the status
quo until the substantive motion for a stay pending appeal
can be considered on the merits, and does not constitute in
any way a decision as to the merits of the motion for stay
pending appeal."  *Doe v. Trump*, 944 F.3d 1222, 1223 (9th
Cir. 2019).  Based on our preliminary review of the record,
we conclude that the status quo would be seriously disrupted
by an immediate stay of the district court's order.

As explained above, until August of this year, the Bureau
had been operating for several months under the COVID-19
plan.  That plan represented a revised schedule to account
for the challenges caused by the COVID-19 pandemic.  It
included extended deadlines based on the understanding that
the Bureau would need additional time to complete the
necessary field work and data processing to produce an
accurate census report.  The district court's September 5
temporary restraining order and September 24 preliminary
injunction preserve the status quo because they maintain the
Bureau's data-collection apparatus pending resolution of the
appeal.  By the time the district court entered its order, the
Bureau had already begun winding down its field operations
and terminating census field workers in anticipation of the
Replan's accelerated September 30 deadline.  The process of
disbanding thousands of census workers will resume if an
administrative stay is put in place, eliminating the Bureau's

ability to conduct field work. Accordingly, on the facts of this case, staying the preliminary injunction would upend the status quo, not preserve it.

We are mindful of the potential harms faced by both parties. Here, not only would the status quo be upended by an administrative stay, the Bureau's ability to resume field operations would be left in serious doubt. Thousands of census workers currently performing field work will be terminated, and restarting these field operations and data collection efforts, which took years of planning and hiring efforts to put in place, would be difficult if not impossible to accomplish in a timely and effective manner. Granting the administrative stay thus risks rendering the plaintiff's challenge to the Replan effectively moot.

We also recognize that missing the December 31 statutory deadline risks serious harm to the government. However, the record does not demonstrate that the Bureau's ability to meet that deadline is affected by the district court's injunction. Rather, the evidence in the administrative record uniformly showed that no matter when field operations end—whether September 30 under the Replan or October 31 under the COVID-19 Plan—the Bureau will be unable to deliver an accurate census by December 31, 2020. The President, senior Bureau officials, senior Department of Commerce officials, the Office of Inspector General, the Census Scientific Advisory Committee, and the Government Accountability Office have all stated that delivering a census by December 31 without compromising accuracy is practically impossible, and has been for some time. As the district court recognized, after the Bureau realized the pandemic would prevent it from adhering to its original schedule, the Bureau made two requests to Congress: first, it requested the December 31 deadline be extended to April

2021. When no final congressional action had been taken on that request in July, the Bureau requested $443 million to cover the additional cost to complete the census by year's end. Contrary to the dissent's repeated assertion, the only undisputed fact in this sequence was that Congress has not given the Bureau the extension or the additional funding it needs to meet the statutory deadline.

The government did not counter the Appellees' showing on this point. Citing the chorus of statements made by the Bureau and other officials, the district court found that the Bureau could not meet the December 31 deadline. Indeed, despite the government's persistent argument in the district court and before our court that the September 30 deadline for terminating field operations is essential to meeting its December 31 statutory deadline, the administrative record compellingly supports the district court's conclusion that moving the October 31 deadline to September 30 will not allow the Bureau to complete the census on time.

Finally, we note that notwithstanding the pendency of the government's emergency request for an immediate administrative stay to allow the Replan's September 30 deadline to take effect, on September 28 the government again changed the deadline for completing field work. The government informed us in a September 28, 2020 letter, without explanation, that it now intends to end field operations on October 5, 2020. This abrupt change contradicts the government's argument that the September 30 date is vitally important to the Bureau's ability to meet its statutory reporting deadline. Our dissenting colleague cites a September 28 estimate suggesting that the census is 98% complete. This is still below the enumeration rate required by the Bureau's internal standards for generating an accurate census report. Further, the district court ruled on September

24 and found, as of that date, the Bureau had met its standard in only four states.

Given the extraordinary importance of the census, it is imperative that the Bureau conduct the census in a manner that is most likely to produce a workable report in which the public can have confidence. The Bureau must account for its competing constitutional and statutory obligation to produce a fair and accurate census report. The hasty and unexplained changes to the Bureau's operations contained in the Replan, created in just 4 to 5 days, risks undermining the Bureau's mission.

Our dissenting colleague makes four errors. First, the dissent applies the wrong standard for a preliminary administrative stay. In *Doe #1 v. Trump*, our circuit definitively resolved which standard applies to administrative stay motions. We are not free to depart from that standard. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that a three-judge panel may not overrule a prior decision of the court). Citing the dissent from *Doe #1 v. Trump*, our colleague applies the factors used when we consider a motion for stay pending appeal. This analysis erroneously collapses the distinct legal analyses for an administrative stay and a motion for stay pending appeal. When considering the request for an administrative stay, our touchstone is the need to preserve the status quo. We defer weighing the *Nken*[1] factors until the motion for stay pending appeal is considered. *See Doe #1*, 944 F.3d at 1223.

Second, as a consequence of its threshold error, the dissent does not grapple with the factor that drives the outcome of the government's motion: the Bureau's

---

[1] *Nken v. Holder*, 556 U.S. 418, 426 (2009).

12          NAT'L URBAN LEAGUE V. ROSS

apparatus for conducting field work will be dismantled before the motion for stay pending appeal can be decided. The dissent does not dispute that issuing an administrative stay in this case would return the Bureau to the process of dismantling its data-collection infrastructure and terminating its field staff.

Third, although we need not wade into the underlying merits of the issues on appeal, we would be remiss if we did not note that the dissent hinges on the unsupported premise that the Bureau can meet the December 31 deadline if an administrative stay is issued. The dissent's assumption that the agency can still meet its deadline relies entirely upon one conclusory statement that was not in the administrative record but was instead prepared for litigation. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020) (explaining that an agency's *post hoc* rationalizations "must be viewed critically"); *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008) (rejecting a justification for agency action that "is entirely absent from the administrative record"). Given the consistent picture painted by the administrative record, it is not surprising the district court was unpersuaded by this sole conclusory statement.

Fourth, the dissent addresses several issues that are not properly before us at the administrative stay stage. The government's emergency motion does not contest the district court's conclusion that Appellees have standing to bring their claims. Nor does the emergency motion challenge the district court's conclusion that the Bureau's decision to adopt the Replan is an unreviewable political question. Thus, those issues are not properly before us and we do not reach them.

Because the status quo would be upended, rather than preserved, if an administrative stay is issued, the government's request for an immediate administrative stay set forth in Docket Entry No. 4 is denied.

Appellees' response to the emergency motion is due October 2, 2020. Appellants' optional reply is due by October 3, 2020.

BUMATAY, Circuit Judge, dissenting:

COVID-19 has wreaked an undeniable toll on the Nation. The virus has already stolen too many American lives. Even more have been hospitalized or fallen ill. And nearly every American's plans this year have been roiled by the virus. But it cannot roil the law. Contorting the Administrative Procedure Act, and liberating itself from any semblance of judicial restraint, the district court injected itself into a sensitive and politically fraught arena: the 2020 census. After the Department of Commerce adopted a plan to address census delays from the COVID-19 pandemic, plaintiffs brought suit under the APA. Upon reviewing the internal deliberative emails of the agencies, the district court decided that it knows better than the Secretary of Commerce. Based on internal discussions about the agency's ability to complete the census in a timely and accurate fashion, the district court essentially overruled the Secretary's decision to adopt the revised plan. But it is undisputed that this new plan was the only way to meet the statutory obligation to report the census results to the President by December 31, 2020. No matter for an adventurous district court: it simply cast aside the statutory deadline as part of its injunction.

Because the district court was without authority to issue its injunction, the defendants are likely to succeed on the merits, and they will be irreparably harmed without relief, I would have granted the request for an administrative stay. Accordingly, I respectfully dissent.

## I.

A census is required by our Constitution, which provides that the "actual Enumeration" of the population shall be conducted "in such Manner as [Congress] shall by Law direct." U.S. Const. Art. I, § 2, cl. 3. As should be evident from this text, besides requiring that such an enumeration shall occur, the Constitution otherwise vests "virtually unlimited discretion" with Congress. *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996); *see also Baldrige v. Shapiro*, 455 U.S. 345, 361 (1982) (recognizing Congress's broad discretion over the census). Congress, in turn, has vested substantial discretion with the Secretary of Commerce to determine how to conduct the decennial census. *See* 13 U.S.C. § 141(a); *Wisconsin*, 517 U.S. at 19 ("Through the Census Act, Congress has delegated its broad authority over the census to the Secretary."). But there's one aspect that Congress did not delegate: the date for completion of apportionment counts. 13 U.S.C. § 141(b). That deadline is etched in stone: December 31, 2020.[1] And

---

[1] Congress has provided for other deadlines as well. For example, the Census Bureau must "take a decennial census of the population" starting on April 1, 2020, and report the results to the President by December 31, 2020 (the deadline primarily at issue in this case). *See* 13 U.S.C. § 141(a)–(b). After receiving this report, the President must calculate "the number of Representatives to which each State would be entitled" and transmit that information to Congress by January 10, 2021. *See* 2 U.S.C. § 2a(a). Finally, the Bureau must report a tabulation of

there's one branch Congress has not delegated any census decisions to: the judiciary.

Cognizant of its statutory deadlines—but unaware of the looming health crisis—the Census Bureau adopted a final operational plan for the 2020 Census in December 2018. This plan has two major phases: a data-collection phase and a data-processing phase. During the data-collection phase, field employees follow up at non-responding addresses and collect other crucial information. Only after this phase is complete can the Bureau begin processing the collected data to report to the President by the December 31 deadline.

But even the best laid plans can go awry. Just as the data collection phase was set to begin, the COVID-19 pandemic struck, forcing the Bureau to suspend its field operations for four weeks. To resume those operations, the Bureau adopted the COVID-19 Plan on April 13, 2020, which set new deadlines for the data collection and dating processing phases, on the assumption that Congress would extend the statutory deadlines by 120 days. Congress did not act, however, so the Bureau adopted the "Replan" schedule, which outlined expedited deadlines designed "to accelerate the completion of data collection [] by our statutory deadline of December 31, 2020, as required by law[.]" According to the Bureau, it was able to meet this compressed timeframe by (1) offering financial incentives to increase the number of hours each enumerator worked and achieve the "same work hours as would have been done under the original time frame"; and (2) taking advantage of updated software and processing capabilities not available during the 2010 Census in order to maximize enumerator effectiveness. An

population for redistricting to the states by March 31, 2021. *See* 13 U.S.C. § 141(c).

16          NAT'L URBAN LEAGUE V. ROSS

Associate Director at the Bureau attests that the agency "is confident that it can achieve a *complete and accurate* census and report apportionment counts by the statutory deadline following the Replan Schedule." (emphasis added).**[2]** Under this plan, field operations would conclude by September 30, and data processing would begin on October 1. The Bureau asserts that it must complete the data collection phase by September 30 and turn to the data processing phase by October 1 to meet its December 31, 2020 deadline. *See* Motion at 1. On September 28, 2020, the Bureau extended its internal deadline slightly: setting October 5, 2020 as the target date for concluding field operations.**[3]** As of September 28, 2020, the Bureau reports over 98% enumeration nationwide.**[4]**

## II.

Whether to grant a request for a stay is governed by the familiar four-factor test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Doe #1*

---

**[2]** Inexplicably, the majority's decision simply ignores this attestation when claiming that even under the Replan, "the Bureau will be unable to deliver an accurate census by December 31, 2020." Majority Op. at 9.

**[3]** United States Census Bureau, *2020 Census Update*, https://www.census.gov/newsroom/press-releases/2020/2020-census-update.html.

**[4]** United States Census 2020, *Total Response Rates by State*, https://2020census.gov/en/response-rates/nrfu.html.

*v. Trump*, 944 F.3d 1222, 1225 (9th Cir. 2019) (Bress, J., dissenting) (simplified).[5]

We should have granted an administrative stay here because defendants are likely to succeed on the merits. The Secretary's decision to adopt the Replan—rather than simply ignore a statutory deadline—was not arbitrary and capricious. At bottom, the district court's APA analysis seems to turn on the court's apparent disagreement with whether the census will be sufficiently accurate under the Replan. But the accuracy of the census is likely a nonjusticiable political question; a properly deferential review would find the Replan satisfies statutory and constitutional requirements; and the plaintiffs here do not appear to have standing because their alleged injuries are not redressable. I discuss each flaw with the district court's injunction in turn.

### A.

Putting aside momentarily the fact that the crux of this case is not justiciable, *see, infra*, § II-B and II-C, and assuming that the APA applies here and that the Replan can be considered a "final agency action," *cf. NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (challenges

---

[5] The majority suggests that I apply the "wrong standard for a preliminary administrative stay." Majority Op. at 11. But as Judge Bress has already persuasively explained: "the instant request for a temporary stay is part of the request for a stay pending appeal, and the Court cites no authority for why the usual stay factors—including likelihood of success on the merits—would not apply." *Doe #1*, 944 F.3d at 1226 (Bress, J., dissenting). We can't simply ignore the fact that the government is likely to prevail on the merits here. That's particularly true where, like here, the parties have addressed the merits in the request for a stay and the opposition thereto. *See id.*

to 2020 census "design choices" were not final agency actions under the APA), the Replan does not violate the APA.

Under the APA, agencies must engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Where census decisions are concerned, this only requires the Secretary to "examine the relevant data and articulate a satisfactory explanation for his decision." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019). "We may not substitute our judgment for that of the Secretary." *Id.* Nor may we "subordinat[e] the Secretary's policymaking discretion to the Bureau's technocratic expertise." *Id.* at 2571 (Bureau staff's conclusions are not "touchstones of substantive reasonableness."); *accord Wisconsin*, 517 U.S. at 23 (Because it is the Secretary "to whom Congress has delegated its constitutional authority over the census," "the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision.").

To make reasoned decisions, agencies must consider "significant alternatives." *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993). The defendants did so. As a Bureau Associate Director explained, the Bureau "considered a variety of options and evaluated risks" in crafting the Replan, ultimately "select[ing] those that we believed presented the best combination of changes to allow us to meet the statutory deadline without compromising quality to an undue degree." Although the Replan compressed several steps, which might "increase the risk" of errors, the Associate Director explained that efficiencies new to the 2020 Census nevertheless allowed the Replan to "achieve a complete and accurate census."

The core of the district court's reasoning is that the Secretary erred in considering the deadline fixed and then trying to maximize accuracy within that constraint. The court thought the Secretary should have been more flexible and considered other alternatives. But all of the alternatives would require the Bureau to consciously blow a statutory deadline. For example, the district court suggests the defendants could have considered "not adopting the Replan while striving in good faith to meet statutory deadlines." Or, as the plaintiffs put it, "Defendants could have continued to operate under the COVID-19 Plan while striving to meet statutory deadlines." But the COVID-19 Plan was premised on Congress extending the statutory deadlines. By adhering to that plan despite Congress's inaction, the defendants would necessarily not be striving in good faith to meet the deadline; they would be consciously abandoning it.[6] "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996). Thus, *a fortriori*, an agency need not consider alternatives that violate the law. The Bureau cannot be liable for failing to consider an alternative that would undisputedly violate the clear deadline set by Congress to obtain marginal improvements (of some unknown degree) to the census.

The district court also erred in determining that the Secretary's reason for adopting the Replan ran contrary to the facts. The district court noted that some Bureau employees thought it would be impossible to accurately

---

[6] This same core defect infects the other proposed alternatives, such as making "good faith efforts to meet the deadline" short of adopting the Replan and "balanc[ing]" accuracy and timeliness concerns.

complete the census by December 31, given the COVID-19 delays.[7]  But each statement relied on was made *before* the Replan, which the Bureau's Associate Director has attested will reach sufficient levels of accuracy.  In any event, "there is nothing even unusual" about a Cabinet secretary "disagreeing with staff, or cutting through red tape."  *New York*, 139 S. Ct. at 2580 (Thomas J., concurring in part and dissenting in part).  The Secretary is owed "wide discretion" in this arena because "it is he to whom Congress has delegated its constitutional authority over the census." *Wisconsin*, 517 U.S. at 22; *see* 13 U.S.C. § 141(a).  Dissent from inferior employees at the Bureau cannot constitute "facts" that the Secretary's decision runs "contrary" to.  *See Wisconsin*, 517 U.S. at 23 ("[T]he mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision.").  To hold otherwise would impermissibly "subordinat[e] the Secretary's policymaking discretion to the Bureau's technocratic expertise."  *New York*, 139 S. Ct. at 2571.

---

[7] The court also suggests that the Commerce Department pressured the Bureau to cease seeking an extension of the deadline, though nothing in the record before this panel suggests this is so, and the district court's citations show only that the Bureau did not affirmatively request an extension in certain instances.  Even if that were true though, it cannot undermine the Bureau's stated reason that it adopted the Replan because it realized Congress would not extend the deadline.  *See New York*, 139 S. Ct. at 2576 (2019) (Thomas J., concurring in part and dissenting in part) (courts defer to executive agency and it is entitled to a presumption of regularity in part because crediting accusations of pretext, which can be easily lodged by "political opponents of executive actions to generate controversy," could "lead judicial review of administrative proceedings to devolve into an endless morass of discovery and policy disputes").

Finally, the district court concluded that the defendants "failed to sufficiently consider" their obligations to produce an accurate census because "the Replan will decrease the census's accuracy and undercount historically undercounted individuals." But the need to consider accuracy does not give courts license to act as a super Census Bureau. The Secretary is "required to consider the evidence and give reasons for his chosen course of action," but "[i]t is not for us to ask whether [the] decision was 'the best one possible' or even whether it was 'better than the alternatives.'" *New York*, 139 S. Ct. at 2571 (citation omitted). The Bureau fulfilled the deliberative requirement by considering the Replan's impact on accuracy. *See Providence v. Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (Agency action is arbitrary and capricious where the agency "*entirely failed*" to consider an important aspect of the problem.) (emphasis added).

## B.

Although the district court ostensibly conducted APA review of the procedures the Secretary used to adopt the Replan, the crux of the court's decision is its view that the Replan would not produce an accurate census. But the "accuracy" requirement is a general duty arising from the Census Act, not a specific statutory or constitutional mandate. *See New York*, 139 S. Ct. at 2568–69 ("[B]y mandating a population count that will be used to apportion representatives, *see* [13 U.S.C.] § 141(b), 2 U. S. C. § 2a, the Act imposes a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment.") (simplified). And it is for the Secretary, under the authority Congress delegated to him, to balance the need for accuracy against the statute's hard deadline.

Although justiciability arguments are only raised briefly on the pending motion for a stay, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Deciding whether the census meets a free-floating concept of "accuracy" is exactly the type of political question that courts are powerless to adjudicate. Virtually all of the factors announced in *Baker v. Carr*, 369 U.S. 186 (1962), support a finding of this being a nonjusticiable political question.[8] Principally, the district court's "accuracy" requirement is not amenable to "judicially discoverable and manageable standards." *See id.* at 217. How accurate is accurate enough? *See, e.g.*, *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 322 (1999) ("[T]he Bureau has always failed to reach—and has thus failed to count—a portion of the population.").[9] And what standard are courts

---

[8] These factors include: a textual commitment of the issue to a coordinate political branch, a lack of judicially discoverable and manageable standards for resolving it, the impossibility of deciding without an initial policy determination of the kind clearly for nonjudicial discretion, or the impossibility of a court's undertaking independent resolution of the question without expressing a lack of respect due coordinate branches of government. *Baker*, 369 U.S. at 217.

[9] *See also Wisconsin*, 517 U.S. at 6 ("[Various] errors have resulted in a net 'undercount' of the actual American population in every decennial census."); *Karcher v. Daggett*, 462 U.S. 725, 732 (1983) (recognizing that "census data are not perfect," and that "population counts for particular localities are outdated long before they are completed"); *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973) (remarking that census data "are inherently less than absolutely accurate"); *accord* C. Wright, History and Growth of the United States Census 16–17 (1900) (noting that the accuracy of our first census in 1790

to use when evaluating accuracy anyway? Neither the district court nor this panel offer any answers.

But the answer is actually quite simple: it would be impossible for us to decide this case "without an initial policy determination of the kind clearly for nonjudicial discretion." *See Carr*, 369 U.S. at 217. Even under ordinary circumstances, the Secretary and Bureau must juggle many important considerations when designing the census plan. For example, in choosing the date for when to end its data-collection phase and begin its data-processing phase, the defendants must consider the trade-offs between terminating field operations (even though not everyone has been counted) against the time needed to process the data into the Secretary's report to the President and the States. *See* 2 U.S.C. § 2a(a); 13 U.S.C. § 141(c); *see also NAACP*, 945 F.3d at 191 ("'Setting aside' one or more of these 'choices' necessarily would impact the efficacy of the others, and inevitably would lead to court involvement in 'hands-on' management of the Census Bureau's operations."). With each decision, the Bureau must consider (and choose among) the various tradeoffs each option presents. By requiring the Bureau to prioritize an elusive standard of accuracy over and above the interest in completing the census in a timely manner, *as prescribed by Congress*, the court substitutes its own policy determination for those set by Congress and delegated to the Secretary.

Analogous cases have held similar claims to be nonjusticiable political questions. Just last year the Court held that trying to decide among "different visions of fairness" for districting maps is an "unmoored determination

---

was seriously questioned by the man who oversaw its implementation as Secretary of State, Thomas Jefferson).

of the sort characteristic of a political question beyond the competence of the federal courts." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2499–2500 (2019) (internal quotations omitted); *accord Nixon v. United States*, 506 U.S. 224 (1993) (constitutional provision granting the "the sole Power to try all Impeachments" does not "provide an identifiable textual limit on the authority which is committed to the Senate"). So too here: determining the "accuracy" of the census is no more of a judicial question than determining the "fairness" of districting maps.[10]

To be sure, courts may entertain some challenges to census-related decisions. But cases treating such challenges as justiciable involved narrow and deferential review—not a freewheeling inquisition into the "accuracy" of the census. In *Department of Commerce v. New York*, for example, the Court considered whether the Secretary could add a citizenship question to the census consistent with the Enumeration Clause and Census Act. 139 S. Ct. at 2566, 2569. On the constitutional challenge, the Court reviewed only for whether the addition of the challenged question bore a "reasonable relationship to the accomplishment of an actual enumeration." *Id.* at 2566. On the statutory question,

---

[10] Nor does the fact that plaintiffs brought their claims under the APA change the political question analysis. *See* 5 U.S.C. § 702 ("Nothing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground[.]"); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 366 (4th Cir. 2018) (Niemeyer, J., dissenting) ("§ 702(1)'s recognition of 'other limitations' on the scope of APA review reflects Congress's intent to maintain longstanding prudential limits confining the judiciary to its proper role in our constitutional system, such as the political question doctrine."); *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 92 (D.D.C. 2016) (holding that political question doctrine precluded review of APA claims).

the Court deferentially considered "whether the Secretary examined the relevant data and articulated a satisfactory explanation for his decision." *Id.* at 2569. The Court's other census cases likewise involved this type of narrow and deferential review. *See Wisconsin*, 517 U.S. at 19–20 ("[S]o long as the Secretary's conduct of the census is consistent with the constitutional language and the constitutional goal of equal representation, it is within the limits of the Constitution.") (simplified); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (similar); *see also U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458–59 (1992) ("The polestar of equal representation does not provide sufficient guidance to allow us to discern a single constitutionally permissible course" among multiple options.).

When our review morphs beyond these precedents into an interrogation of "accuracy," of the type underlying the district court's APA analysis here, we are beyond our proper role as judges. Some legal questions—even ones arising under the same constitutional provision as previously justiciable questions—might prove to be nonjusticiable. *See New York v. United States*, 505 U.S. 144, 185 (1992) ("[T]he Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions" even if most do). Thus, while the court might be competent to decide whether a particular decision bears a "reasonable relationship" to the goal of an "actual enumeration," the same cannot be said of evaluating the "accuracy" of a census. Indeed, the Court has rejected the claim that its prior cases require "a census that was as accurate as possible" and has recognized that "[t]he Constitution itself provides no real instruction" on how to measure the "accuracy" of a census. *Wisconsin*, 517 U.S. at 18; *see also Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1417 (7th Cir. 1992) (Posner, J.) ("It might be different if the apportionment clause, the

census statutes, or the Administrative Procedure Act contained guidelines for an accurate decennial census, for that would be some evidence that the framers of these various enactments had been trying to create a judicially administrable standard.").

We cannot mechanically apply the political question doctrine, which must be considered in light of the important separation of powers function it performs. A court's authority to act depends on a threshold question of the "appropriate role for the Federal Judiciary": whether the claims brought "are claims of *legal* right, resolvable according to *legal* principles, or political questions that must find their resolution elsewhere." *Rucho*, 139 S. Ct. at 2494 (emphasis in original). Here, these background principles weigh in favor of not adjudicating this dispute. No census has been, or can be, fully accurate, according to the Court. *See Wisconsin*, 517 U.S. at 6 ("Although each [census] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal."). Determining what level of accuracy is sufficient is simply not something that the judicial branch is equipped to do.**[11]** Indeed, "[i]t would be difficult to think of a clearer example

---

**[11]** The district court and plaintiffs seem to think that the district court's injunction does not require judicial supervision over the accuracy of the census. Instead, they frame the injunction as merely preventing the Secretary from adopting the Replan because it failed to follow the requisite procedures for doing so. But the crux of the district court's injunction is its disagreement with the Secretary's resolution of how to balance accuracy of the census against the statutory deadline. *See, infra*, § II-A. And in ordering relief, the district court has inserted itself at the top of the Executive branch's census operation. *See* Motion at 17 (describing ongoing supervision of the district court under the preliminary injunction).

of the type of governmental action that was intended by the
Constitution to be left to the political branches directly
responsible—as the Judicial Branch is not—to the electoral
process. Moreover, it is difficult to conceive of an area of
governmental activity in which the courts have less
competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).
By allowing census-accuracy supervision under the guise of
APA review, we have "given the green light for future
political battles to be fought in this Court rather than where
they rightfully belong—the political branches." *DHS v.
Regents of the Univ. of California*, 140 S. Ct. 1891, 1919
(2020) (Thomas, J., concurring in part and dissenting in
part).

### C.

Plaintiffs also likely fail to establish Article III standing,
given that they have not shown that their alleged injury is
redressable by the courts, even assuming the other standing
requirements are met. An injury is necessarily not
redressable if the court has no authority to authorize the
relief requested. *See Gonzales v. Gorsuch*, 688 F.2d 1263,
1267 (9th Cir. 1982) (Kennedy, J.) ("Redressability requires
an analysis of whether the court has the power to right or to
prevent the claimed injury."); *Republic of Marshall Islands
v. United States*, 865 F.3d 1187, 1199 (9th Cir. 2017)
(holding that a lawsuit seeking to enforce a treaty right was
not redressable because "the federal courts have no power to
right or to prevent . . . violat[ions of] a non-self-executing
treaty provision").

Clearly, a district court has no authority to order an
Executive agency to disobey a Congressional statute.
Neither the district court nor plaintiffs have cited any
authority for this unprecedented expansion of the judicial
power to decide cases and controversies. *See* U.S. Const.

Art. III, § 2. Congress makes laws, the Executive enforces them, and we interpret them in the course of adjudicating disputes. Absent the metaphorical "striking down" of an unconstitutional statute, we are impotent to set aside congressionally enacted laws. *See United States v. Booker*, 543 U.S. 220, 283 (2005) (Stevens, J., dissenting in part) ("[T]he Court simply has no authority to invalidate legislation absent a showing that it is unconstitutional. To paraphrase Chief Justice Marshall, an 'act of the legislature' must be 'repugnant to the constitution' in order to be void.'" (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803))). Here, no one challenges the constitutionality of the statute establishing the Secretary's deadline. Accordingly, the district court had no authority to ignore it—let alone order an Executive agency to do so.

All of the cases relied on by the district court to enjoin operation of the statute, despite not finding any constitutional infirmity, are wholly inapposite. None suggest that a court can require an agency to *disobey* a statute; they merely confirm that an agency is not necessarily precluded from acting, even if it is doing so after a statutory deadline. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (holding that despite statute's mandatory deadline, post-deadline action taken by the agency was not void because there was no Congressional intent that agency would be deprived of statutory authority to act if it did so beyond the deadline); *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1304 (D.C. Cir. 1991) (similar). The fact that an agency can—depending on the text, structure, and history of the statue at issue—continue to act beyond its statutory deadline, says nothing about a court's authority to *require* an agency to do so.

## D.

An agency's decision on how to respond to a once-in-a-century pandemic, in order to meet its statutory deadline, is quintessentially the type of decision we should give substantial deference to. Throughout this pandemic, we've deferred to the elected branches to determine how to best respond, even when shuttering our churches and businesses. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (denying Free Exercise Clause challenge to application of California's stay-at-home order to in-person religious services based on deference to elected branches during pandemic). We've done so despite our role in protecting individuals' constitutional rights. *See On Fire Christian Ctr., Inc. v. Fischer*, 2020 WL 1820249, at *6 (W.D. Ky. 2020) (although "a state may implement emergency measures that curtail constitutional rights" during a pandemic, it cannot enact measures that are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law"). If deference is appropriate there, surely it is doubly appropriate here, where courts are already required to show deference to the agencies. *See New York*, 139 S. Ct. at 2578 & n.3 (Thomas, J., concurring in part and dissenting in part) (explaining highly deferential review of an "agency's discretionary choices and reasoning under the arbitrary-and-capricious standard"); *Wisconsin*, 517 U.S. at 19–20 (explaining narrow and deferential review of Secretary's census decision). Simply put, there's no basis to anoint ourselves supervisors of this sensitive process at the eleventh hour.

## III.

At a minimum, we should have granted an administrative stay while we further considered the underlying motion to stay the injunction pending appeal. The government faces

irreparable harm from our refusal to do so. It's undisputed that if the government cannot finalize the data collection phase of the census and move into the data processing phase in a timely fashion, it will likely miss its statutory deadline.

Thus, even if the court ultimately rules for the defendants on the merits, it might not matter much: the plaintiffs will have effectively secured the relief they seek on the merits (e.g., a delay of moving into the data processing phase). In contrast, the defendants have said only that it would be "difficult" to rehire and redeploy workers once terminated, if they are allowed to do so, but not that it would be impossible to revamp these workers if needed. Accordingly, although an administrative stay would be inefficient if ultimately reversed later, the damage would not be irreparable. At most it would present a bureaucratic hassle for the agencies. The same cannot be said for the majority's decision to deny the administrative stay. Similarly, the district court, and now the majority, fail to consider the harms that irreparably flow to other States. *See* Amicus Brief at 8 ("The effect of the TRO was to run up the census tally in Plaintiffs' jurisdictions at the expense of lagging jurisdictions like Louisiana and Mississippi."); *id.* at 8–9 (noting "disruption of redistricting and reapportionment in 24 states that have constitutional or statutory deadlines" tied to census).

Finally, the status quo here, to the extent that's relevant, is the legal landscape that would have existed prior to the district court's judicial misadventure. *See Doe #1*, 944 F.3d at 1229 (Bress, J., dissenting) (explaining that preserving the status quo is not an enumerated factor, but in any event, an administrative "stay simply suspends judicial alteration of the status quo, while the injunctive relief granted below constitutes judicial intervention upending it") (simplified).

Accordingly, we should have granted the request for an administrative stay to restore the parties to the positions they were in prior to the district court's decision.

## IV.

Despite its errors, the district court deserves some credit. It seems to have been motivated by a valiant attempt to balance two competing priorities: accuracy of the census versus timeliness under the statutory deadline. But the elected branches have already done this balancing. The Secretary of Commerce was briefed on all of the Bureau employee concerns the district judge found persuasive. The Secretary considered those concerns, and then, in exercising the role that the President appointed him to perform, made the decision to proceed with the Replan. "By second-guessing the Secretary's weighing of risks and benefits and penalizing him for departing from the Bureau's" views about the Replan, the district court, and now the majority, "substitute[] [their] judgment for that of the agency." *New York*, 139 S. Ct. at 2571. Likewise, Congress was aware of the potential problem and did not extend the deadline. The House of Representatives held committee hearings and ultimately voted on a bill to extend the deadline. The Senate received the bill, held committee hearings on it, but then took no further action—and hasn't since July 2020.[12] Plaintiffs suggest that the Senate might act on the bill soon.[13]

---

[12] https://www.congress.gov/bill/116th-congress/house-bill/6800/all-actions?overview=closed.

[13] Plaintiffs' Opposition at 14 n.1 (citing Hansi Lo Wang, Bipartisan Senate Push to Extend Census Begins Weeks Before Count Is Set to End, NPR (Sept. 15, 2020), https://www.npr.org/2020/09/15/913163016/bip

There is no basis for the judiciary to inject itself into this sensitive political controversy and seize for itself the decision to reevaluate the competing concerns between accuracy and speed, after the elected branches have apparently done so already—or are actively doing so now. *See Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring) ("Failure of political will does not justify unconstitutional remedies."). Plus, had we ruled for the defendants, nothing would have prevented the elected branches from revisiting this dispute at a later date. A belated fix might entail additional cost and delay that the district court's injunction avoids. But in our constitutional design, courts are not empowered to swoop in and rescue the elected branches from themselves. If additional cost and delay is the consequence of Congress's inaction, or the Secretary's decision to adopt the Replan, then so be it. The recourse for such problems lies with the People themselves at the ballot box—not with unelected and unaccountable judges in chambers.

I respectfully dissent.

---

artisan-senate-push-to-extend-census-begins-weeks-before-count-is-set
-to-end).